## Tilden Ames and another v. The Port Huron Log Driv-ing and Booming Company.

No one without express authority of law can become a purchaser of property which it is his duty to sell for the best price it will bring.

Unless in proceedings to collect the public revenue, no person can legally be divested of his property without remuneration or against his will, unless he is allowed a hearing before an impartial tribunal, where he may contest the claim set up against him, and be allowed to meet it on the law and the facts.

The statute of 1855 for the formation of Rafting Companies (*Comp. Laws, Ch.* 66), in so far as it undertakes to authorize the companies formed under it, with-out any necessity arising from the obstruction of their own business, to assume the control and management of the logs of unconsenting parties which are being floated on public waters, and to enforce compensation against the logs for thus controlling and managing them, is unconstitutional.

    1. It allows persons thus organizing to assume a police power over the waters used, and thus to exercise a public office without either an election or an ap-pointment.

    2. It deprives persons of their property without due process of law, since under the statute the corporation or its agents must of necessity determine when the case arises which justifies assuming such control, and the corporation afterwards assesses its own charges, and proceeds to sell the property to pay them, with the added expenses of sale.

Error to St. Clair Circuit. The case is sufficiently stated in the opinion of Justice CAMPBELL.

*W. T. Mitchell* and *A. B. Maynard,* for plaintiffs in error:

1. The act under which the Port Huron Log Driving and Booming Company was organized, is unconstitutional and void.

It is in derogation of common right. It assumes to give to any company, organized under its provisions, the power and right to take charge and control of any public stream or waters within this State, and to bar all others of right thereto and therein. It is in conflict with Sec. 4, Art. 18 of the Constitution, which provides that "No navigable stream in this State shall be either abridged or dammed, without authority from the Board of Supervisors of the proper county, under the provisions of law. No such law shall prejudice the right of individuals to the free navigation of such streams."

The whole intent and scope of the law is to give to any company, organized under it, the entire and absolute control of the stream they may choose to do business upon. The company is made the sole arbiter and judge of the manner the stream shall be used, what are obstructions, and when they shall be removed.

And notwithstanding all its provisions to the contrary, it puts such company in the sole control of such stream, and ousts all others from its use and navigation. Such, at least, have been found to be its practical operations.

It is unconstitutional and void also because a company organized under it may take the property of third persons, make assessments thereon, sell and dispose of the same, without trial by jury, and without due process of law.

This power is contained in Sec. 6 of said act, which confers upon any such company the highest attribute of sovereignty—that of eminent domain—and the right to take property without any of the guarantees or formalities of the law of the land.

No opportunity whatever is given to the party dispossessed, to show that there was no necessity for the company to render the services, or that the assessment was too much, erroneous, or invalid; but the company is permitted, in its own volition, to take and dispose of the property of others, without the least showing of occasion, and no provision for remedy or defense is made.

The phrase "*due process of law*," can not mean less than a prosecution or suit, instituted and conducted according to prescribed forms and solemnities, for determining guilt or ascertaining title to property. The same measure of protection against legislative encroachment is extended to *life, liberty and property ;* and if the latter can be taken without a forensic trial and judgment, there is no security for the others: — *Sedw. on Stat. and Constl. Law,* 534 ; 4 *Hill,* 140 ; 10 *Yerg.* 59 ; 4 *Dev.* 1 ; 2 *Green (Iowa)* 22 ; 6 *Barr,* 87 ; 16 *Penn. R.* 256 ; 4 *McLean,* 498 ; *Blackwell on Tax Titles,* 27, 34 ; 11 *How. Pr. R.* 289 ; 4 *Mic* 125 ; 2 *Hen. & M.* 336.

These rights have been too long guaranteed to be now disputed or done away with, to sustain any doubtful act of the Legislature, especially to sanction any privileges conferred on a corporation, the grants to which are always strictly interpreted, and taken most strongly against the grantees. Such companies can take nothing by implication : — *Sedgw. Const. and Stat. Law,* 338.

The only instances in which the right of property can be transferred, without strictly complying with these constitutional restrictions, are in the cases of assessments and sales of property for taxes, or charges imposed upon property either by the State, in the exercise of its sovereignty, or of local (that is, municipal) corporations, clothed with certain attributes of sovereignty, and these exceptions have been sustained only on the ground of immemorial usage and state necessity. The exceptions and the reason

for them are proof conclusive of the universality and force
of the rule in all other cases.

2. If the law could be held to be constitutional, the
sale would still be void, for the company could not act
as both buyer and seller at the same time: — 14 *Pick.*
356; 2 *Mich.* 192; *Walk. Ch.* 346; 1 *Mason,* 341; 1 *Harr.*
259; 2 *Johns. Ch.* 241.

*Conger & Harris,* for defendants in error:

The Supreme Court in the case of *Moore v. Sanborn,*
2 *Mich.* 519, decided clearly, and with great particularity,
the rights and liabilities of individuals and the public
upon the navigable streams of the State — and especially
those connected with the vast lumber operations on its
waters.

That this decision was supported by the authorities, and
founded upon the nature and necessities of one of the
most important interests to the public, has never been
questioned.

At the next session of Legislature thereafter, the law
under consideration was passed; and its provisions coincide
with, and conform to, the decision in the case above cited.
The Court held that, "the length and magnitude of many
of our rivers, the occasions and *necessities* for their use,
and the nature and character of our internal commerce,
all require a liberal adaptation of those doctrines to our
circumstances and wants, both as to capability of our
streams for public use, and for the *occasions* of such use,
entirely different, from, and in many respects altogether
new, to those which concurred to establish the common
law rule. And, we accordingly find that, in all the States,
that rule has been enlarged so as to meet the condition
and wants of the public, and the *necessities* of trade and
commerce: "— *Citing* 1 *McLean,* 530; 2 *McLean,* 376; 10
*Johns.* 237; 2 *Fairf.* 278; 3 *N. H.* 321; 31 *Me.* 9; *Ang.*
*on Waterc.* 546, 550.

We claim that the object, design and operation of this law, accords as well with the spirit of the decisions quoted, as with the Constitution. The company was not organized for the purpose of making money for its members, but to facilitate great public interests, in which plaintiffs and defendants were alike interested; and was for a general beneficial purpose to all log owners on the stream.

CAMPBELL J. :

The facts material to the decision of this case are briefly as follows: Plaintiffs bring suit to recover for certain logs purchased by them of the Black River Steam Mill Company. That company had let out to certain parties a contract for cutting, hauling, running and delivering the logs at their boom at or near the mouth of the Black River. The defendants, who were organized in due form under Chapter 66 of the Compiled Laws, assumed to exercise their functions over the main portion of the river over which these logs were to be floated. The contractors referred to did not make adequate provision for running the logs under their contracts. The amount of logs they contracted to deliver was two million feet, and there had been placed in the river, including this, sixty million feet belonging, except as above, to other owners. Defendants undertook and claimed to control all this lumber under the statute. Jams and obstructions were caused from time to time by the accumulation of logs which filled the stream. Defendants without the consent of any one assumed control of the logs of the plaintiffs, and run them down and delivered them at the boom, where they were run in by the owners or their employees or contractors. Defendants took from the boom logs enough to satisfy their claim for services, and advertised and sold them under the statute, and bid them in. The amount of their claim for expenses was made up by assessing the whole expenses of the company *pro rata* upon all the logs, including the

office and incidental expenses of the company, a sum paid for the transportation by land of a large amount of logs of other persons to avoid crowding the stream, and an amount paid a dam owner for flooding the stream to aid in floating down the logs in it.

This statement will suffice to explain the points arising in the case, as far as we deem them material for that purpose.

Inasmuch as the control of the logs of the Black River Steam Mill Company was put in the hands of their contractors, there is no room for any contract relation between plaintiffs and defendants; and the proceedings and claims of the latter depend for their validity entirely upon the statute under which they assume to act. And we deem it proper, in consideration of the necessity which seems to exist of having the rights of the numerous parties concerned understood as far as may be, to pass upon the principal questions discussed in the case and presented by the exceptions.

The defendants became purchasers at their own sale. This was clearly illegal. The statute does not authorize it; and it is a settled doctrine in this State that no one can, without express authority of law, become a purchaser of property which it is his duty to sell for the best price it will bring. The duties of a seller can not be permitted to be affected by the interest of a buyer; and our courts have adopted the rigid rule of avoiding all such sales absolutely: — *Dwight v. Blackmar*, 2 *Mich*. 330; *Clute v. Barron*, 2 *Mich*. 192.

It was also claimed on the hearing that if defendants ever had any valid lien they lost it by delivery of the logs. The facts are not clear on this point, and we therefore abstain from deciding whether such a delivery would or would not be a relinquishment of any of the rights which the statute was designed to secure.

The principal inquiry we are called upon to enter into

relates to the authority of such companies to assume control over logs of unconsenting parties, and to enforce compensation against the logs for thus controlling and managing them.  As the exercise of such privileges is resisted upon grounds of constitutional immunity, it becomes necessary to understand in the outset precisely what condition such companies are placed in by the statute, and by other rules of law bearing upon the question.

It was decided in *Moore v. Sanborn*, 2 *Mich.* 519, that there was a common right of floatage in all streams susceptible of valuable use for lumbering.  The statute under which the defendants were incorporated recognizes and attempts to secure this right.  There can be no doubt of the fact, which indeed is apparent from the case before us, that there are many streams which are incapable of furnishing a commodious passage for all the lumber in their vicinity, and that in the attempt to crowd them to their utmost capacity, it is difficult if not impossible to insure the safe transit of logs without some general concert of action in keeping the stream open and clear of jams and obstructions.  The statute however has not undertaken to regulate the use of any stream by uniform rules of priority or conduct; neither has it given to any person or company any monopoly, partial or total, in its enjoyment.

It authorizes any number of persons not less than five, to organize into a company, requiring them in their articles to show on what waters they design to carry on their operations.  Any person who has logs to be run on those waters is entitled to become a member, and to have his logs run at a ratable proportion of the company expenses, and to have a longer notice previous to any sale for charges than strangers.  The company is empowered to contract with those who are not members for the same work.  The statute does not prohibit the creation of more companies than one to transact business on the same waters.  We have heretofore,

on a former hearing of these cases, decided that there is no constitutional objection to so much of the statute as allows companies to organize and enter into contracts: — *Ames v. Port Huron Log Driving and Booming Company*, 6 *Mich.* 266. The present controversy arises out of the part of the law which assumes to give rights not arising out of contract.

The sixth section provides that whenever any, person puts logs or lumber into such waters without providing adequate force and means for breaking rollways and jams, or running, driving, booming, rafting, securing or clearing the banks of the same, and shall thereby obstruct the navigation or clearing the banks, such company may cause the rollways or jams to be broken, and the lumber to be run, driven, boomed, rafted, secured, or cleared from the banks, at the owner's expense, and shall have a lien on so much thereof as shall be sufficient to satisfy all just and reasonable charges proportioned to their amount and the expenses of running and securing the same, with power to sell for these charges and for the expenses of sale, on ten days notice personally served, or posted in three places in the town where the lumber is held, and a like notice in the company's office, describing the property by its marks and supposed ownership, and specifying the amount of their claim. A longer notice is given where log owners have filed a description of their log-marks in the office ; but it is to be given in the same way.

These companies, which can be formed by any persons at their option, and which require no intervention or approval of any public authority, are authorized by this act to exercise some very important prerogatives. Their powers, if valid, may be carried out without any necessity arising from the obstruction of their own business. The law permits them, whenever the stream is obstructed by logs or lumber not adequately manned, to assume possession and manage and control it entirely, and collect their

own charges out of the proceeds of a sale in the mode referred to above. This renders them a species of river police, with power, not only to render help at the owner's expense so long as the obstruction continues, but also to absolutely deprive him, upon the first obstruction, of any further possession or management of his own property. Such a power bears no resemblance to that of persons who are obstructed in the exercise of their right of passage to remove a public nuisance which affects them individually, and must be abated before they can enjoy their own legal privileges. If the aggrieved party has a claim for expenses incurred in moving other property to forward his own, such a claim rests therefore on principles of its own, and if valid derives its validity from the circumstances which rendered the labor expended necessary. Those circumstances would not justify him in excluding the owner from aiding in the work, or in any interference beyond the fair exigencies of the case. A power of control over property, such as is set up and claimed by the corporation before us, depends for its validity entirely upon the statute.

We are met therefore, at once, by the question whether, on a stream open to all persons, the law can authorize a voluntary organization of persons, whether citizens or aliens, who may choose to assume a corporate character, to control, or authorize their servants and agents to control the property of those who are lawfully entitled to free navigation.

It is difficult to perceive by what process a public office can be obtained or exercised without either election or appointment. The powers of government are parcelled out by the Constitution, which certainly contemplates some official responsibility. Every officer not expressly exempted is required to take an oath of office as a preliminary to discharging his duties. It is absurd to suppose that any official power can exist in any person by his own assump-

tion, or by the employment of some other private person; and still more so, to recognize in such an assumption a power of depriving individuals of their property. Such claims are inconsistent with any idea of government whatever. And it is plain that the exercise of such a power is an act in its nature public and not private.

The case, however, involves more than the assumption 'of control. The corporation, or rather its various agents, must of necessity determine when the case arises justifying interference, and, having assumed possession, it assesses its own charges, and having assessed them proceeds to sell the property seized to pay them, with the added expenses of such sale. These proceedings are all *ex parte*, and are all proceedings *in invitum*. Their validity must therefore be determined by the rules applicable to such cases.

Except in those cases where proceedings to collect the public revenue may stand upon a peculiar footing of their own, it is an inflexible principle of constitutional right that no person can legally be divested of his property without remuneration, or against his will, unless he is allowed a hearing before an impartial tribunal, where he may contest the claim set up against him, and be allowed to meet it on the law and the facts. When his property is wanted *in specie* for public purposes, there are methods assured to him whereby its value can be ascertained. Where a debt or penalty or forfeiture may be set up against him, the determination of his liability becomes a judicial question, and all judicial functions are required by the Constitution to be exercised by courts of justice or judicial officers regularly chosen. He can only be reached through the forms of law upon a regular hearing, unless he has by contract referred the matter to another mode of determination.

When a company proceeds under this statute to take charge of logs in the stream, several questions of a judicial nature present themselves. The principal are, first

whether the circumstances exist which give the right of interference with the property in the stream; second, whether the company actually assumed charge of it, and safely and diligently moved and delivered it; and third, what was the legitimate expense of performing the services. All of these involve questions of fact, upon which there might easily be conflicting testimony. A party whom it is sought to charge has a right to have these questions of fact settled, before he can be compelled to pay such demands, or to have his property sold to satisfy them. If such a case does not come within the familiar constitutional rules, which assure to every one the right to due process of law, which preserve the right of trial by jury, and which vest judicial powers in stable hands, it would be difficult to find any meaning in those maxims. They have been so frequently and uniformly applied in cases like this that a citation of adjudged cases appears a useless ceremony. No case can be found anywhere, which would remove these questions from judicial cognizance.

The statute under which the company defendant was incorporated not only makes all proceedings *ex parte*, but makes the company judge in its own cause, and empowers it to execute its own judgments. Such a proceeding is too plainly illegal to admit of an extended argument.

The judgment below should be reversed, and judgment rendered on the finding for plaintiffs, for nominal damages, with costs of both courts.

MARTIN Ch. J. and CHRISTIANCY J. concurred.

MANNING J.:

I concur in a reversal of the judgment on the ground first stated in the opinion of my brother Campbell. The statute does not authorize the company to purchase at its own sale.

As this disposes of the case I should prefer to say

nothing on the constitutional question. But as my brother Campbell has given an opinion concurred in by my brother Christiancy and the Chief Justice, holding that part of the statute unconstitutional which for all practical purposes gives vitality and life to companies organized under the act, in which I can not concur, I feel bound to state my reasons for differing with them on so important a question.

It is important in the investigation of all questions, if we would arrive at the truth, to occupy a stand point from which every part of the case may be seen and appreciated.

State constitutions (it is different with the Federal Constitution, which in some respects resembles our State constitutions and in others not) are a limitation on, and not a grant of legislative powers. Hence, when the constitutionality of a statute is called in question, we look to the Constitution not for the power of the Legislature but for its negation. The question is, have the people by their Constitution withheld the power from the Legislature? This is the only question. Want of power is not to be presumed. It must appear from the language of the Constitution itself, or be clearly inferred from its several parts and general structure. But it is not to be inferred from the inexpediency or hardship of the law; for expediency is an element in the enactment of all laws, of which the Legislature is the sole judge.

In construing a statute, it is the duty of the Court, if possible, to give such a construction to it as will bring it within the Constitution, and not one that will make it void.

With these principles in view, I will proceed to give my reasons for holding the act in question constitutional.

The act provides for the incorporation of companies, consisting of five or more persons, for running, driving, booming and rafting of logs, timber and lumber, on the navigable waters of the State. Many of our streams are small

and navigable only for floating logs. And for this they are inadequate to the wants of the community, and can not be used to their full capacity, unless each person attends to his own logs in such a way as to prevent them of themselves, or in connection with the logs of others, from forming jams or obstructions in the stream. To secure such attention the act was passed, permitting persons running logs to form themselves into companies, and securing to every person having logs to run a right to become a member upon application, by signing the articles of the company, and paying his just proportion of the expense of managing and conducting its affairs: — *Comp. L.* § 1941. No exclusive privileges are given by the act. Rival companies may be formed. And the common law rights of individuals to run logs are expressly reserved.

The next section (§ 1942), which contains all the provisions of the act obnoxious to the constitutional objection, is in these words:

"If any person or persons shall put, or cause to be put, into said stream or waters any logs, timber or lumber, and shall not make adequate provision, and put on sufficient force for breaking rollways and jams of such logs, timber or lumber, in or upon such stream or waters, or for running, driving, booming, rafting, securing, or clearing the banks of the same, and thereby obstruct the floatage or navigation, or clearing the banks of such stream or waters, it shall be lawful for said company to cause such rollways or jams to be broken, and such logs, timber or lumber to be run, driven, boomed, rafted, secured or cleared from the banks of such stream or waters, at the charge and expense of the person or persons owning said logs, timber or lumber; and said company shall have a lien upon such quantity of said logs, timber or lumber, as shall be sufficient to pay and satisfy all just and reasonable charges against the same, proportionate to their number, quantity, and the expense of running and securing the same as aforesaid,

and may sell at public action, on not less than ten days notice, either personally served upon such owner, or posted in three or more conspicuous places in the township where such logs are held; and in either case, by posting a like notice in the office of said company, of the mark, description, and supposed owner of such logs, timber or lumber, and the amount of the charges for which the same is to be sold, a sufficient quantity of such logs, timber or lumber, to satisfy such claim, charges or demands, with the expense of such sale." See also the next section (1943) as to lien and compensation.

To authorize the company to take possession of the logs of another two things must concur: 1st. The company must be obstructed by such logs, in running its own logs; 2d. The owner or person running such logs must have neglected to put on sufficient force to run them. I think this the only construction that can fairly be given to this section, when we look to the whole act, in connection with its title, which is,.. "An act to provide for the formation of companies for running, driving, booming and rafting logs, timber and lumber, and for regulating the floatage thereof." But, suppose it susceptible of a different construction, that would make it unconstitutional; that construction should be adopted that will give effect to the statute in preference to one that will make it void.

If I am correct in my construction of the statute, there is no ground for saying the act is for the voluntary formation of companies to exercise police powers over navigable streams; and hence there is no occasion for discussing the constitutionality of such an act. Private rights are all it attempts to define and regulate. And what are those rights?

The obstruction of a navigable stream, without authority of law, is a nuisance, which any person rightfully navigating the stream and injured thereby may remove. The company would have had a right to remove obstructions.

that interfered with the prosecution of its business, had no such power been given to it by the act. Any person, stopped in the highway by a nuisance, may remove it so as to permit him to pass. But he can not take possession of the thing that formed the nuisance, and carry it with him, and retain possession of it until he is compensated by the owner for the labor and trouble it has given him. His only remedy for the detention it has occasioned him and for removing it, is an action on the case. So it would be with defendant, but for the additional remedy given the company by the act under which it was organized. The reason for this new remedy is obvious. The use of streams for floating logs is all in one direction. It is down stream. And when no one attends the logs to keep them in the current, they run aground or against the banks of the stream, and becoming entangled form obstructions to navigation. To break these, the logs have got to be freed from their entanglement, and to be sent floating down the stream to form new obstructions lower down, if no one is sent with them, to be in their turn removed by the impeded navi_ gator. In the case of a highway the obstruction may be removed from the beaten track to one side of the road, and the traveller pursue his journey without further molesta- tion. When once rid of the nuisance he has nothing further to apprehend from it. It is not ambulatory. It does not go before him to block up his path anew. And he is not under the necessity of carrying it with him, or causing it to precede him to get rid of the evil. Hence the neces_ sity for this new remedy and its reasonableness, and the duty of the Court to give it full force and effect.

I see nothing in it injuriously affecting the rights of individuals. If one puts on sufficient force to run his own logs, the company can under no circumstances take pos- session of them under the act. And if he neglects this it is not right that he should have his logs run at the

11 Mich.—K.

expense of the company, who must run them in order to run its own.

Neither do I see any thing of an official character in the exercise by the company of the powers conferred upon it. Is the distraining of cattle found trespassing upon the land of another an official act? Is a distress for rent an official act? There is nothing whatever of an official character in either. They are the exercise of private rights, nothing more; as the taking possession of an estate that has been forfeited is a private and not an official act. Nor is there any thing judicial in either, for the act of the party does not determine his right, which may afterwards be inquired into and determined by a court of competent jurisdiction. It is not necessary to impannel a jury to decide on the trespass, or the amount of rent due, before making the distress, or the forfeiture before taking possession of the thing forfeited. Neither is it necessary, at each successive step in the accrual of the company's rights under the act, that a judicial investigation should take place. The whole case is open in all its parts to judicial inquiry when any one claiming in opposition to the company thinks proper to contest its rights. Until this judicial investigation is taken away by the Legislature, or attempted to be, there is no ground for saying the company decides judicially on its own rights; or that the plaintiffs are deprived of their property without the forms of law, or an opportunity of being heard in a court of justice.

The policy of statutory laws is with the Legislature in all cases. It is not confined to acts for the collection of revenue. I know of no constitutional provision placing revenue laws, in this respect, on a different footing from other statutory laws. When the constitutionality of such laws have been questioned, courts have sometimes spoken of them as revenue laws, not because of any exception in the Constitution in favor of such laws, but as a reason for their apparent harshness or severity. Courts may ingraft

exceptions on common law rules, because such rules originate with themselves; but I know of no power in the judiciary to interpolate constitutional exceptions. I will not say it may not have been done in some cases, but never I think, under a claim of right in the court to do it.

The act has taken from plaintiffs in error the. most plausible pretext that could be urged against such a law, viz: that the company determines arbitrarily and on no fixed principle its own compensation. This would not be the case if the act was silent on that point. The company's compensation would be whatever it was proved to be worth to run the logs. But the act provides that the plaintiffs in error shall pay what the members of the company pay, and no more. The expenses of the company are assessed *pro rata* on all the logs run by it, whether they belong to a member of the company or to one who is not a member.

*Judgment reversed.* *

*At the same time with the foregoing was decided the case of *John Beard and another v. The Port Huron Log Driving and Booming Company*, in which the following opinion was delivered:

CAMPBELL J.: This was an action of assumpsit, and as we have decided [in Ames v. the same defendants, 6 *Mich.* 266], that these companies can make contracts, there is no objection to the use of that form of action. But the case was put to the jury in such a way as to involve the same questions raised in *Ames* against *the same de-fendants*. For this reason the judgment should be reversed and a new trial granted. As the evidence itself is not given, it is somewhat difficult to determine precisely the extent to which the other rulings were applicable, and we therefore do not pass upon them, or undertake to decide how far any inference of a contract relation between the parties could be justified.

The other Justices concurred.